RYDER, Judge.
Hugh McLymont seeks review of the trial court’s judgment entered on a jury verdict finding him guilty of manslaughter with a firearm and attempted second degree murder with a firearm. We reverse.
On August 21, 1987, Harriet McLymont, appellant’s wife, was killed. The cause of death was a single shotgun wound to the head. The crime occurred sometime after 7:00 p.m. on that date. The only direct evidence of how this crime was committed comes from the testimony of appellant, McLymont, and another victim of the alleged crime, Ivan Davis.
Mr. Davis testified that he had known both the decedent, Harriet McLymont and appellant for some time. He had first met Mrs. McLymont at a party at a friend’s house. He considered himself to be friends with both appellant and his wife. On the day in question Mr. Davis encountered Mrs. McLymont on the street. Mrs. McLy-mont asked Mr. Davis to stop by her house to look at the remodeling being done there and he stated he would. Mrs. McLymont then left and went home and Mr. Davis went about his business of making telephone calls at a public telephone booth. He then left the telephone booth and started towards Mrs. McLymont’s house; however, he came upon a friend of his with whom he had a conversation. After completing his conversation, he left the area and drove to Mrs. McLymont's home.
Mr. Davis testified that upon his arrival at the McLymont home, he called out to Mrs. McLymont from the front yard. Mrs. McLymont responded by coming out the front door and inviting him inside. Mr. Davis and Mrs. McLymont then had a conversation prior to entering the home about how nice the home looked outside. Then Mr. Davis and Mrs. McLymont went inside and proceeded upstairs. Mr. Davis testified that they never entered the bedroom upstairs but merely looked into it from the hallway. After having looked around upstairs, they returned downstairs, eventually having a seat at the kitchen table. Mr. Davis testified that after he seated himself at the kitchen table, he first observed appellant at the bottom of the stairs which led to the bedroom. Appellant had a shotgun in his hand. Mr. Davis testified that appellant uttered an obscenity and shot him. Mr. Davis then tried to reason with appellant, but appellant shot him a second time. Mr. Davis testified that he then exited the home and as he was leaving the area he heard Mrs. McLymont say, “Keith, don’t shoot me” (“Keith” and appellant are the *709 same person). Mr. Davis then heard gunfire inside. Mr. Davis left the area and drove to a friend’s home, and the friend drove him to the hospital where his gunshot wounds were reported to the police.
Appellant’s taped statement was introduced into evidence and revealed that appellant had reason to believe that his wife was having affairs with other men while he was out of state working. Appellant was working for his brother in New York during this time. As a result of a telephone call he had with his wife, he decided to return to Florida to see if he could resolve his domestic problems. Appellant returned to Fort Myers by a commercial airline and was picked up at the airport by a friend at approximately 4:00 p.m. on the day in question. Appellant stated that he had his friend drive him to the vicinity of his home but was dropped off on the street behind his house. He then sneaked across to his property to see if his wife was home. She was not there so he decided he would hide in the house and attempt to catch her with the other man. Appellant hid in the utility room of the house and awaited her return home.
In a short while, Mrs. McLymont returned home. Appellant stated that she walked back and forth in the house in a manner which made appellant suspect she was expecting someone. She then made a telephone call and told someone to “wait a while and then come on.” About fifteen or twenty minutes later a car drove up. A person entered the home and went into the dining room area with Mrs. McLymont. Appellant heard them talking and eating. Then they went upstairs as Mrs. McLy-mont showed the man the house. They went into appellant’s and Mrs. McLymont’s bedroom. They were in there quite a while when he heard his wife say, “[s]top not now. Wait a while and go away and I’ll call you, and you come back.” Appellant stated that this made him angry. He was thinking about obtaining his shotgun from behind the refrigerator when Mrs. McLy-mont and her friend began coming downstairs. He returned to the utility room to avoid being detected.
Appellant further stated that Mrs. McLy-mont and her friend were once again seated at the dining room table talking about appellant when appellant peeked out of the utility room and observed Mrs. McLymont wiping Mr. Davis’ face. At this point, appellant decided to confront them. He walked past them to the refrigerator and obtained his shotgun. Both Mrs. McLy-mont and Mr. Davis were so shocked to see appellant that neither moved or in any way attempted to stop him. Appellant retrieved his shotgun from behind the refrigerator, pointed the gun at Davis and asked him what he was doing there. Mr. Davis responded, “[y]ou got the wrong person.” Appellant stated that at that point Davis “pops up” from the chair and said “I’m leaving.” Appellant was “steaming mad” and he pulled the trigger to the shotgun. The first shot hit Davis somewhere in the chest. Davis then came at appellant and they struggled over the weapon with Davis gaining control over it. Appellant knew his wife had a gun in her purse and so he made an attempt to get it. As he was reaching for it, Davis fired the shotgun in his direction. The shot missed appellant but struck Mrs. McLymont in the head. Appellant stated that Davis then left the scene with the shotgun.
During the trial, the state called Sgt. Steve Lux, through whom the state introduced the statement that appellant had given to him regarding the events of the shooting. Appellant told Sgt. Lux that he shot Davis twice before Davis took the shotgun from him. The statement further indicated that after Davis took the shotgun from him that appellant heard him pull back the bolt. Appellant stated that a three shot bolt action .410 shotgun was used in the crimes. Following this testimony, the state proffered the testimony of Sgt. Lux on how this particular type of shotgun is used.
During argument preceding the proffer, the prosecutor told the court that the evidence would demonstrate that appellant’s account of the events was impossible. The prosecutor said that since there were two spent casings in the area and appellant’s statement had indicated that Davis had *710 worked the bolt of the shotgun a third time, this should have ejected the remaining shell from the three-shot bolt action .410 shotgun used in the crimes.
Counsel for appellant objected on the ground that Sgt. Lux had not been qualified as a firearms expert. The prosecutor then said that he proposed to show this through a demonstration. Appellant’s counsel again objected arguing that a demonstration would prejudice the jury and that a shotgun had not been listed on discovery and that therefore a demonstration would be improper. He also restated his objection that Sgt. Lux had not been qualified as a firearms expert. Following rebuttal by the prosecutor, appellant’s counsel again mentioned that the shotgun had not been furnished in discovery and moved for a mistrial.
Following argument over whether it should be allowed because the state could not show that the demonstration gun was the same model as the one involved in the crimes, the trial judge announced that he was taking judicial notice that there were only two .410 models made and that from what had transpired he could tell that the type of gun the state was going to use for the demonstration would be conclusive for the type of operation the state sought to demonstrate. Following some further argument, the court ruled that the state would be able to make its demonstration. The court did, however, instruct the prosecutor to inform the jury that that particular weapon had not been used in the crimes.
The state first established Sgt. Lux’s familiarity and experience with handguns and shotguns. It then established that the demonstration shotgun had no evidentiary value in the case, but that it was like the one described by appellant in his statement. Sgt. Lux then described the shotgun and how it worked for the jury. He went on to testify that the sequence of events to which appellant had testified would have left the gun unloaded at the time appellant said that Davis supposedly shot the victim.
When defense counsel objected to the demonstration of the shotgun because the shotgun being used had not been furnished in discovery, the trial court should have held a hearing to determine whether there had been a discovery violation. See Richardson v. State, 246 So.2d 771 (Fla.1971); Lee v. State, 538 So.2d 63 (Fla. 2d DCA 1989). If a trial court determines that a discovery violation has occurred, the trial court then has the “discretion to determine whether the violation resulted in harm or prejudice to the defendant, but this discretion can be properly exercised only after adequate inquiry into all the surrounding circumstances.” Lee, 538 So.2d at 65.
The trial court in this case erroneously failed to hold a hearing to determine whether a discovery violation had occurred and if so, whether it resulted in harm or prejudice to appellant. Accordingly, the case is reversed and remanded for a new trial and for proceedings consistent with this opinion.
Because the issue discussed above effectively disposes of the case, we do not find it necessary to address the other issues raised by appellant.
Reversed and remanded.
SCHEB, A.C.J., and PATTERSON, J., concur.